Good morning, your honors. I am Curtis Cole. I represent attorney Anthony Cornerans, who was the attorney representing Mr. Bappi Lahiri in a case called, originally, Lahiri v. Universal Music. Mr. Cornerans is here in the courtroom with me today. I do not intend to repeat the points that I made in our briefs. I believe that we covered them thoroughly. Perhaps too much, though. Well, where is he in the courtroom? Mr. Cornerans, would you mind standing up? No, I don't. I just didn't know whether that was a gentleman or not. This is Mr. Goldman. Hey, he looks good. He looks like a movie star. Again, I do not intend to repeat the points that I made in my briefs. But one thing I would like to point out is that the opening of the appellant's opening brief, in order to give the court some perspective on a case that is frivolous at its inception, I gave three examples. And unfortunately, none of those three examples involved a case allegedly frivolous at its inception. But fortunately, the American Bar Association journal that just came out has an article on the very subject that brings the five of us here together today, and that is the question of sanctions. In that article, the author very briefly and concisely described a case frivolous at its inception. Imagine your client is served with a complaint. The complaint is riddled with innuendo, false accusations, and conspiracy theories. It reads like a misbelieved novel. That is not this case. The operative pleading in this case, which Mr. Cornarens filed on behalf of Mr. Lahiri, read as follows, in paragraph 29. The single, referring to the song, Addictive, has been extremely successful and has sold in excess of 300,000 copies. It was in the top 10 of the United States popular music charts, and as observed by a number of front page articles in the Indian press, represents the first time that a Hindi song has been among the top 10 selling United States popular singles. There was nothing frivolous about that complaint. It was not frivolous. No question about the fact that it was a success, but why don't you deal with trademark and copyright as it exists under the Indian law and the US law and the confusion that that injected into this case? Yes, Your Honor, and probably the best way to do that would be to focus upon the question of performance rights. You may recall that the district court, at the time of the third argument on the motion for summary judgment, pointed out in a question to Mr. Cornarens, what does the performance right that Mr. Lahiri has in his song have to do with, in effect, the song Addictive that was broadcast by Universal Music? And the simple answer to that question is the performance right was a separate right. There were multiple rights in the music in question, and there was nothing about the decision upon which the district court ultimately relied that said anything to the contrary. That was the entire dispute about the judgment in the IPRS versus EIMPA case that was the focus of the court's ultimate conclusion. It read that decision as saying, in effect, there's only one right. What Mr. Cornarens said repeatedly in his complaint and repeatedly throughout the litigation, what Universal acknowledged and acknowledges to this day is that there is a performance right in the music, and it was that upon which Mr. Cornarens was suing. In his complaint, Mr. Cornarens points out that he is not making a claim on behalf of Mr. Lahiri for music in synchronization with the film. And that's a critical point that was lost upon the district court, at least the second judge who considered this case, I submit it, was not lost upon the first judge, who viewed the case very, very differently and who was taking the case in a very different direction. The first judge who saw this case recognized we're talking about multiple rights. We don't need to sort out which rights and so on and so forth. We can allow the substance of the litigation to go forward and resolve the case in that fashion and leave it to these competing copyright holders or claimants of copyrights, in any event, to work it out between themselves. And indeed, they did, as you know, by way of the settlement agreement in question. But the second judge. But you mean when Lahiri and Saragama reached a settlement agreement? Is that what you're talking about? Correct. I am referring to the second. But that didn't settle. That just settled the matters between themselves, not just the copyright. You could read it that way. That's exactly the way Universal reads it. As concerns the parties, and most importantly, as concerns Judge Kelleher, that was sufficient to allow the case to go forward as to the substance. As Judge Kelleher noted, and I think it's important for the first two times that the issue was served up, that this was an attempt to manufacture an issue in the case. As Judge Kelleher put it, the court is not convinced by defendants' attempts to manufacture an issue. And Judge Kelleher said, Lahiri and or Saragama's standing is valid because either one or both of them did possess the copyright of TOTA. And that was the point of the litigation. Let's move forward from there. Judge Kelleher also said the copyright of TOTA is long in question. Even they didn't acknowledge to the judge that they possessed the copyright in TOTA when they entered this agreement in 2004, did they? I'm sorry, Your Honor. I missed the first part of that. Saragama claimed to own the copyrights in the song TOTA. It is true. And Lahiri claimed to own some copyrights in the song TOTA. There was a conflict between them, yes. And there was no US copyright, right? Well, the two parties in question claiming copyrights went to the US Copyright Office, as you know. That's reflected in the record and registered. But we're really talking about Indian copyright law here, which is why, from the outset, when Mr. Cornerans moved to amend the complaint, he specifically referred to Indian copyright law. And I will point out, it was Mr. Cornerans who brought to the attention of the court the IPRS versus EIMPA decision. I will repeat, it was Mr. Cornerans who brought that to the attention of the court and, coincidentally, to the attention of Universal Music. It was Mr. Cornerans who provided to the court with the motion to amend the complaint, to have the copyright claim, a copy of the IPRS decision. The judge imposed, what, a $260,000? He did, indeed. Why don't you talk about that? I think that was an abuse of discretion, Your Honor. I don't think that there was evidence to support it. I think that, quite frankly, when the court did assess Mr. Cornerans for this. The hourly accumulation in this case, I think, was unconscionable. Your Honor, I would argue beyond that that the claim that Mr. Cornerans was acting frivolously from the outset was unconscionable, but I agree with you. I believe that Mr. Cornerans should be exonerated here. I believe that there was a difference of interpretation of an Indian opinion between Mr. Cornerans and the judge. You have had provided to you by Mr. Cornerans an opinion of an attorney who explains how Indian appellate decisions are written. The statement by Universal Music that the footnote that Justice Iyer wrote to the decision in IPRS is otios, and therefore meaningless, is false. To this day, to this day, Indian appellate courts cite the totality of the decision in IPRS versus EIMPA, and they characterize it as the decision. They quote Justice Iyer's part of the decision. I have examples of them as recently as last year. The reason is that their appellate decisions are different than ours, as we pointed out in our brief. If there is a dissent, then the third justice comes forward and offers an opinion. That is why, under Indian law, Mr. Cornerans correctly pointed out, consistent with what he was told by Mr. Anand, the Indian copyright lawyer upon whom he relied, that this was part of the decision. Yes, yes, Judge Wright read the word otios as wiping out in totality Justice Iyer's portion of the judgment. But that is not the way Indian law works, and the record reflects how Indian law works. Incidentally, before I leave today, I wish to correct another misstatement that's been made by Universal Music throughout this case, that the copyright claim was Mr. Corneran's idea. False. The record is to the contrary. As a matter of fact, even Universal Music cited the testimony of Mr. Lahiri as to how the issue of copyright came up. Mr. Lahiri receives royalties for the song Tota. Now think about that for a minute. That is in the record. Why is it? Because he has rights. What rights? Copyrights. And from whom does he receive them? IPRS, the organization, the Performing Rights Organization in India. The first document in the record brought to the attention of the court when the motion to amend the complaint was added was that IPRS document listing the film's Yogi, listing Mr. Lahiri as the composer, and documenting one of the bases for the many royalties that he receives. How does that happen? It happens because he has rights. What rights? Rights separate from those of the producer of the film. Why? Because the music is played other than in synchronization with the film. That is precisely what Mr. Cornaren said to the court when he first filed the complaint. It was understood by Judge Gellagher. And what bothers me personally as an attorney the most is although there's a difference of opinion about reading a decision of not only another jurisdiction, but another country, and another tradition, but setting that aside, there is so much in the record to show why it was Mr. Lahiri thought he had copyright, why his lawyer, Mr. Anand, thought he had copyright, why the United States Copyright Office. There were misquotes. There was failure to put in brackets. There was all kinds of stuff going on. There was all kinds of stuff. I agree, Your Honor. But that's not the basis for sanctions. Because the basis for sanctions, Judge Wright said clearly, was this was frivolous at its inception. That is the fulcrum of the finding against Mr. Cornaren's. And it fails. The rest of it, we all foreknow, is gloss. It was put in there to justify the sanctions, just like the footnote in the district court's opinion, which said, well, there's other problems with Mr. Cornaren's conduct, as were listed by Universal. I don't know that it was all gloss. But then shouldn't we be? Your time is up. Thank you, Your Honor. May I please report? I'm Jeff Goldman of Jeffer Mangels, Butler, and Marmoreau. And I represent the defendants and the appellees in this case. I'd like to start out, if I may, before the issue gets lost by addressing something that was in the appellant's reply brief that I believe cries out for a response. In the reply brief, there's heavy emphasis placed on a case, an Indian district court case, called Radio Today, which the appellant claims somehow supports his view of Indian law. But as we've seen throughout this case, and as the district court saw throughout this case, that case, that citation is erroneous. In fact, on the internet, at IndianKatoon, K-A-T-O-O-N, dot org, slash dot, slash 1-7-5-0-1-5-9, can be found the appellant's decision in that case, which vacated the decision of the trial court and found that it was premature and should not have been made absent a full hearing in that case. So I suppose that one could argue that that was a mistake by the appellant. But I think what the district court was responding to here was chronic so-called mistakes, chronic so-called misstatements to the court, inserting of words into quotations from cases that weren't there, citing concurrences as holdings, ignoring holdings of dispositive cases of the Indian Supreme Court. And Judge Beeser, I will agree with you that the amount of money that was expended in this case was tremendous. And I would note that through February 1, 2004, which was the day that Mr. Lahiri and Sarah Gama submitted this settlement agreement to the court, which claimed it was a co-ownership agreement, but clearly, if you read it carefully, it was not a co-ownership agreement and did not give Mr. Lahiri any standing at all to be in this court. Up through that date, the defense fees and costs incurred were about $133,000. That included litigating the Lanham Act claim, on which we prevailed, and litigating the summary judgment motions on the copyright claim. After that date, the date that Judge Kelleher was induced to find that there was a co-ownership agreement when, in fact, there was none, my client's fees and costs were roughly $657,000. And even if you affirm the district court's judgment, and clearly, I think you should, there's no doubt that it was not clearly erroneous, my client will still be out of pocket and responsible for roughly 3 5ths of all of the damages caused by Mr. Lahiri. There was an exquisite methodology applied to the computation. We'll take a third of this and a quarter of that and mix it up. The computation is just a dollar judgment. Yeah, so what was included and excluded from the judgment that was entered was a dollar or two. I think the record showed that the vast majority of the fees were caused by the appellant's overzealous prosecution of the claims. To give an example, there were seven depositions taken of my client's representatives. And at those seven depositions, Saragama didn't even attend two of them. And at the five depositions that both Mr. Lahiri's counsel and Saragama's counsel attended, Mr. Lahiri's counsel asked 1,067 pages of questions, and Saragama's counsel asked his 43 pages of questions. And the evidence was replete, and the record is showing that it was virtually all motivated by Mr. Lahiri's counsel. However, what the district court did was simply took half of the fees and costs after a certain date, after the date the copyright claim was in the case and the Lanham Act claim was out of the case, divided those fees in half. The court clearly could have. What was the hourly rate here? Well, there were a variety of hourly rates. I know there was a variety. What was the top hourly rate? I don't recall, but it was probably in the high 400s or the low 500s. That was for my then partner, Mr. Frackman. And my rate was substantially lower than that, and I did the vast majority of the work on the case, along with associates and paralegals. But what the district judge did was he gave Mr. Corneras the benefit of every conceivable doubt. He reduced the fees that he found were attributable to the misconduct by 30% off the top. He added another 10% here, 15% there. He really gave him every benefit of the doubt, leaving us with responsibility for, as I said, about 3 fifths of the fees that I think were plainly caused by the conduct and the misconduct of the appellant. That conduct was delineated by the district court in great detail in his written opinion. The district court was in the best position to observe the misconduct. In fact, the district court noted that, and I guess you could describe this as a sort of consciousness of guilt, that the appellant, just prior to the hearing on the motion that brings us here today, attempted to retain the law firm that the district judge had just come from a couple of years before, plainly for the purpose of forcing the judge to recuse himself, so that this issue could be heard by another judge unfamiliar with the Indian law issues on which the district judge had ruled and unfamiliar with the appellant's tactics. Now, I feel like I need to address something that the counsel said earlier. He emphasized that, well, Indian law. I think that's the way they do things in India. Well, Your Honor, you know, Indian copyright law and US copyright law are really very similar. And they have to be similar, because there are international treaties that require that the signatories of the treaties contain certain protections. So Mr. Corner, as a very experienced copyright practitioner in the US, didn't have to learn an entirely new body of law, because the laws are very similar. And what's in particular what's similar is the discussion that we've heard about the performance right. We've heard that, well, Mr. Lahiri retained a performance right. And so that gives him some sort of right to sue here. But the complaint in this case didn't allege that my clients infringed a performance right. It only alleged that we infringed a reproduction and distribution right. So even at best, if you take even Mr. Corner's distorted view of Indian law, which plainly was repudiated by the Indian Supreme Court, that only says that Mr. Lahiri has a performance right. When his songs are performed on a radio station in India, the Performing Rights Society can collect money. It has nothing to do with what my client is alleged to have done in this case. Does the US Copyright Office respect an Indian copyright? You can get US protection by a filing there? Yeah, I mean, you certainly can sue. Is that the way it's normally done, as opposed to this case? Yes, and it's a ministerial act, generally. The Copyright Office does not have the resources to rule as a matter of use. Was there some kind of track like that taken in the first instance when the movie was being produced? Well, they did not register this. I don't know. They didn't register it for 22 years, until after this use was made. But more to the point, I think, on the Indian life, Judge Kelleher was prepared to say, let's have an Indian court decide this issue. And instead, what the appellant did was concocted a settlement agreement, which kept using the word co-ownership, even though, if you look at the agreement, it had nothing to do with co-ownership. In fact, it says, this agreement as to copyright ownership and the allocation of recoveries from the consolidated cases applies only to the use of FODA in the infringing work addictive. And then it says they have to keep it confidential, and they can't disclose it to anyone. How can you have an ownership agreement that has to be kept confidential and can't be disclosed to anybody else? It makes no sense. But Judge Kelleher was induced, based on their representations over and over again to the court, which we cited in our brief, that the question of ownership had been resolved, that there was an agreement concerning ownership. And that is what caused this case to drag on for four additional years and $666,000 or so more of my client's money. And the judge, I think, did a very careful and very careful job of going through the record in great detail and cut that amount down substantially, more than we would have wanted. But we did not appeal that. And did the judge consider the lawyer's ability to pay when it came to the $666,000? I do not believe that that issue has been raised in any significant way by the appellant. There was scant evidence of an inability to pay. I know that Judge Conlon, in one of the cases that you ruled on a number of years ago, the lawyer put in substantial evidence in a declaration of all of his assets and liabilities that he was going through a divorce. And there was a tremendous amount of evidence in the record suggesting a lack of ability to pay. That evidence is absent here. The evidence is scant and sparse and incomplete. And I don't believe that issue was even raised on appeal. And I think it's been weighed. Say what happens, whatever you do. If, in addition to what, I guess I need to, I might have thought I was going to add one more thing, but I don't think I need to. Oh, dear, I'm all set. Yeah, OK. Your Honor, I'm able to respond to the question you asked. If I could indulge the court for 30 seconds. Sure, I'll give you a few seconds. The answer to your question is yes, there is evidence in the record. Mr. Cornelius did put on evidence of his inability to pay the heavy sanctions that were requested. And he described his ownership of various things and his indebtedness. With regard to the performance rights statement that was just made now by Mr. Goldman, I think that's critical to the fundamental question in this case. I detect a concession that there is a performance right involved. As a matter of fact, it's stated right in Fappelli's own supplemental excerpts. Quote, the copyright referred to by the IPRS may have been the performance right, which is what the Indian Performing Rights Society would be concerned with. The unspecified royalties Lihiri claims to have received may have been performance royalties. Now, Mr. Goldman's response was that Mr. Cornelius didn't plead performance rights. True. But Saragamma did. And Saragamma did repeatedly. And the whole point of this claim was the two were competing for the same claims. That, too, is in the record. I thank you very much. Thank you. And this matter stands submitted. And this court will adjourn. Thank you. All rise for the discussion of that matter.
judges: Conlon, Pregerson, Beezer